<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Civ. No. 04-2783(DRD) |
| Plaintiff, : | |
| : | **O P I N I O N** |
| v. : | |
| : | |
| PORT LIBERTE CONDO 1 : | |
| ASSOCIATION, INC. and STANLEY : | |
| RICHTER, : | |
| : | |
| Defendants. : | |
| _____: | |

Christopher J. Christie, Esq.
United States Attorney's Office
United States Attorney
970 Broad Street
Newark, New Jersey  07102
    By: James B. Clark, III
       Assistant U.S. Attorney
       Attorney for Plaintiff

Michael L. Nestor, Esq.
Lum, Danzis, Drasco & Positan, LLC
103 Eisenhower Parkway
Roseland, New Jersey 07068-1049
       Attorney for Defendants, Port Liberte
       Condo I Association, Inc. and Stanley Richter

**Debevoise, Senior District Judge**

      In this action the United States seeks relief on behalf of Paul Rock, a resident of Port

Liberte, Jersey City, New Jersey, under the Fair Housing Act of 1968, as amended by the Fair

Housing Amendments Act of 1988, 42 U.S.C. §§3601-3619 ("FHA").  Rock alleges that

defendants, Port Liberte Condo 1 Association, Inc., (the "Association") and its manager Stanley

Richter, discriminated against him on account of his disability by assigning him a handicap parking space that was at a greater distance from the entrance to his building than another handicap space.

Rock filed an administrative complaint against Defendants with the Department of Housing and Urban Development ("HUD") on or about July 24, 2003. HUD investigated the complaint and attempted conciliation without success, 42 U.S.C. §§3610(a) and (b), found reasonable cause to believe the Defendants violated FHA, 42 U.S.C. §3610(g)(1), and issued a charge of discrimination, 42 U.S.C. §3610(g)(2). Defendants elected to have the charge resolved in a federal civil action pursuant to 42 U.S.C. §3612(o), whereupon HUD referred the charge to the Attorney General to commence this action. Following discovery and the denial of Defendants' motion for summary judgment, the case was tried without a jury on September 13 and 14, 2006.

This opinion constitutes the court's findings of fact and conclusions of law.

## I. The Facts

The Association's condominiums that are involved in this action are in Buildings 206, 207 and 208 which extend in a line one following the other for a total length of approximately 5500 feet. The parking garage serving these three buildings runs continuously underneath the buildings with approximately 111 parking spaces lined up across from each other on each side of the lengthy underground access roadway that extends down the middle of the parking garage. Looking at a diagram of the three buildings. Building 206 will be deemed to be the to the east, Building 208 will be deemed to be to the west, with Building 207 in the middle. The parking garage will be deemed to have north and south walls extending approximately 5500 feet from

east to west.

The original records of the construction of the condominium are scattered and in a state of some confusion. A recent review of these records by an engineer whom the Association retained and by Building Manager Richter suggests that plans for the structure were reviewed by the City building authorities in 1987 and the building was in place in 1990. In accordance with municipal zoning requirements one parking space was provided for each of the 111 units. Four handicap spaces were provided on the north side of the garage: i) space 31, which was adjacent to a ramp leading to the elevator to Building 206 and 207; ii) space 49, which was approximately 100 fee east of space 31; iii) space 51, which was perhaps 25 feet east of space 49, and iv) space 91, which was approximately 104 feet west of the east end of the garage.

The handicap spaces complied with regulations in effect at the time, but in minor respects would not comply with today's regulations.

On the master deed individual parking spaces were allocated to individual units, the allocation bearing a logical relationship to the proximity of the parking space to the unit above it.

The Master Deed provided:

> (i) "Parking Space" shall mean any space designated on the site plan for the parking of a vehicle which is irrevocably restricted for the exclusive use of a Unit Owner as part of his Unit and which may not be transferred by a Unit Owner to third parties except as an appurtenance to the transfer of the Unit Owner's Unit. A parking space shall not be deemed a separate Unit in and of itself.

When a unit was sold, the parking space designated for it was allocated to the new owner in accordance with the Master Deed. On a few occasions, perhaps two or three, the developer deeded a parking space to a condominium owner, independent of a unit, but generally the spaces were simply assigned to their appurtenant units. No one at the outset sought to have a handicap

space, and those spaces were simply assigned to units without regard to handicap. During the course of the next few years a few owners exchanged or purported to convey parking spaces. This was on an informal basis and was not sanctioned by the Master Deed or with the knowledge or consent of the Association Board.

From 1998 until sometime in 2002 Rock and his wife lived in unit 43 in Building 206 at Port Liberte. Rock was handicapped, suffering from orthopedic/knee problems that made it difficult for him to ambulate and occasionally resulted in his falling as a knee gave way. His assigned parking space while he was in unit 43 was space number 96. This was not a handicap space, but it happened to meet Rock's special needs because it was just across the access road from the entrance door to Building 206, and his neighbor who parked in the space next to space 96, agreed to park his car to the far side of his parking space in order to afford Rock a wider lane to exit and enter his vehicle.

In 2002 the Rocks moved to condominium unit 13 in Building 208 at Port Liberte - at the other end of the three buildings. Parking space number 3 was the space assigned to that unit. Rock asserted that it was not suitable for him in view of his disability because it was too narrow to permit him to swing his car door fully open and it was located more than 100 feet from the entrance to Building 208.

To solve the problem Rock approached another resident of Port Liberte, Charles Lott, who had been using two spaces in the parking garage, space 31, which had been designated on the original plan as a handicap space, and space 101. Rock arranged for Lott to take Rock's old space 96 in exchange for Lott's space 31. Thus Rock could use a handicap space closer to the Building 208 entrance. The potential problem with this arrangement was that it deprived the

owner of the unit to which space 96 was assigned of his parking space.

Rock testified that he informed a member of the management team of this arrangement and that the person he spoke to told him to put it in writing. Government Exhibit 2 is an August 5, 2002 letter that Rock testified he hand delivered and mailed to Richter. It read:

> Dear Mr. Stanley Richter:
>
> As per our conversation I am writing a letter as you requested, officially advising the Management office and the Condo 1 Board that Mr. Charles Lott who resides in the 206 building who is the present owner of handicapped spot #31 in the 208 building and I have switched spot [sic] parking spots. I have switched with him my present spot #96 in the 206 building to Mr. Lott's spot #31 in the 208 building where I now will reside. As you are well aware of I am in need of a handicap spot and there was none available in either the 206 or 208 buildings until Mr. Lott agreed to the switch.
>
> Please change all records according.

Richter, a personal friend of Rock's, testified that he never received this letter, and a search of the Association's modest sized office disclosed no copy. It is unnecessary to resolve this conflict, but it is apparent that the switch was not brought to the Board's attention or approved by the Board at that time or at any subsequent time. The Board did not then have a policy concerning the award of handicap parking spaces, the issue not having yet come up; it did have a policy of requiring approval of switches in parking spaces, but in practice residents traded spots from time to time without objection and without the Board's knowledge or consent. Nevertheless, Rock benefitted from this arrangement without anyone voicing objection for ten or eleven months.

This equilibrium became unsettled when ten months after the Rocks moved from unit 43, Ms. Susan Lanning purchased unit 43 to which parking space 96 was appurtenant. Because

Rock had turned over space 96 to Lott, Ms. Lanning was assigned parking space 3. Space 3 was at the other end of the parking garage from her unit and required that she walk many hundreds of feet from her parking space to the entrance of her unit. She communicated with the condominium management and ascertained that her deed, in accordance with the Master Deed, conveyed space 96 to her.

The condominium Board responded to Ms. Lanning's complaint by requesting Richter to check the records relating to the assignment of parking spaces. He informed the Board of the Master Deed's provisions and of the situation that had arisen by reason of Rock's switch with Lott, specifically Lott's use of space 96 and Rock's use of space 31, neither of which had been properly assigned. He probably advised the Board of Rock's desire to retain space 31 because of his handicap, but that is by no means certain.

The Board decided to restore the parking space situation in accordance with the legal requirements of the Master Deed and the conveyance of the individual units. On May 21, 2003 it sent a letter to Rock, Lanning and Ms. Lott (Charles Lott's wife). It read:

> Re:   Parking Spaces Assigned to Unit 208-13, 206-43, and 206-91
>
> According to our records the parking spaces assigned to the above units are not being used by the owners. Instead, some of you are parking vehicles in parking spaces not assigned to you. We need to resolve this issue in accordance with the association documents prior to implementing the Parking Rules. Our records show the following spaces are assigned to these units:
>
> Parking Space #3 is assigned to Unit 208-13, owned by Mr. Jason Rock.
> Parking Space #101 is assigned to Unit 206-91, owned by Ms. Mary Elizabeth Lott.
> Parking Space #96 is assigned to Unit 206-43, owned by Ms. Susan Lanning.
>
> Please commence parking in the correct spaces. Since the Parking Rules are scheduled to go into effect in the next few weeks, it is important for the correct

> vehicles to be in their proper spaces.  Vehicles parked illegally will be subject to tickets and/or towing.
>
> In addition, our records show that Ms. Lott's unit, 206-91, owns only one parking space, which is space #101.  Ms. Lott claims that she owns two spaces.  In order for us to update our records we need to see an actual deed for the second spot.  Otherwise, the current records will be used when Security monitors the garages for violations of the new Parking Rules.

On June 10, 2003 the Board wrote to Rock notifying him to "cease and desist in parking in space #96 immediately" upon threat of having his vehicle towed.

The various owners to whom the letter was directed followed the instructions, but space 3 was totally inappropriate for Rock, considering his handicapped condition.  Its width was inadequate to permit him to open his car door fully so that he could get out of his car.  It was at a great distance from his building entrance, precluding him from walking to it without pain and the risk of falling.  In fact he was unable to use space 3 and had to park outside the garage, which entailed walking a long distance to his entrance and climb steps.

On June 10, 2003 Rock wrote to the Association voicing his vigorous disagreement with the arrangements that the Board had instituted.  He insisted that because of his handicap he be given space 31.  He undertook to bring full documentation of his handicap to a forthcoming meeting with the Board.  This included doctor opinions and medical records and New York and New Jersey documents evidencing establishment in those states of his handicapped condition.  He informed the Board that "I still remain category 1 - the ability to park almost anywhere" and demanded "[o]nce again I want an answer and I want it fast.  I will not park in 03 until this is resolved.  Mr. Lott is going back to 31 and I'm going back to spot 96."

This is the first time that handicapped parking had become an issue before the Board, as

7

prior to that time no complaints or requests of handicapped persons had been received by the Board. In response to Rock's demands (and threats of litigation) the Board retained an engineer to evaluate whether new handicapped spaces could be created and it circulated the condominium's occupants to determine if there were other handicapped persons who sought handicap parking spaces. It turned out that there were three handicapped persons in the condominium: i) Mr. Rabinowitz, who by happy coincidence was already assigned to a handicap parking space - number 51; ii) Jacqueline Burns who, like Rock, suffered from leg problems that impaired her ability to walk; and iii) Rock. Faced with these competing claims the Board adopted the policy of giving the person who had lived in the condominium the longest priority in selecting a handicap parking space. Burns, who had once been a board member was not present at the meeting when this policy was adopted and did not participate in the decision.

The Board checked Burns's medical records and confirmed that she was handicapped. In accordance with their policy they honored her election to have parking space 31. Richter wrote to Rock on August 4, 2003 to the effect that "[i]n consideration of your request for a handicap parking space, we reassign you to handicap parking space #49." This space is of sufficient width, but it is at a distance of approximately 100 feet from the entrance to Rock's building, imposing additional discomfort upon him while walking and a greater risk of falling than if he were assigned to space 31.

## II. Conclusions of Law

This action is brought by the United States on behalf of Paul Rock to enforce the provisions of Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§3601, et seq. The court has jurisdiction

under 28 U.S.C. §§1331 and 1345 and 42 U.S.C. §3612(o).

In order to make out a claim for a Fair Housing Act violation based on failure to provide a reasonable accommodation, Rock must show: i) that he is suffering from a disability as defined under 42 U.S.C. §3602)h)(1); ii) that the Defendants knew or reasonably should have been expected to know of the disability; iii) that reasonable accommodation of Rock's disability might be necessary to afford him an equal opportunity to use and enjoy his dwelling; and iv) that the Defendants refused to make a reasonable accommodation.  See United States v. California Mobile Home Park Mgt. Co., 107 F. 3d 1374, 1380 (9th Cir. 1997).

There is no dispute in the present case that Rock has established the first three elements of his claim.  He is suffering from a disability as defined in the statute.  Defendants knew of the disability by the spring of 2003 when Ms. Lanning's complaint about her assignment of space 3 caused the Board to investigate the manner in which parking spaces were being informally reassigned by condominium owners without Board sanction.  During the course of rectifying improper parking space usage Rock's disability status was brought to the Board's attention in connection with his insistence that he be assigned space 31.  It is also established that reasonable accommodation of Rock's disability might be necessary to afford him an equal opportunity to use and enjoy his unit.

The evidence establishes, however, that Defendants have provided reasonable accommodation necessary to afford Rock an equal opportunity to enjoy his dwelling. Reasonable accommodation requires an inquiry on a case-by-case basis, Hovsans v. Township of

Brick, 89 F.3d 1096, 1104 (3d Cir. 1996).[1] The matter of Rock's disability and the need to address it was not raised with the Board until the spring of 2003 when Ms. Lanning complained about not being assigned space 96, to which she was entitled, and the Board had to unscramble the improper space trades that had taken place. Rock's disability was brought to the Board's attention in connection with his attempt to retain space 31. Lott had no right to space 31, and Rock acquired no right to it by virtue of his trade of space 96 for space 31. It was a convenient and practical arrangement at the time, but provided no enduring rights in either Rock or Lott.

     Rock had lived at Port Liberte since 1998. He utilized parking space 96 for at least a four-year period of time. That was a non-handicap space. He resolved the width problem through a cooperative arrangement with his neighbor. There was a considerable distance to the entrance to the elevator to his unit, and he apparently had no difficulty navigating it. It is true that upon his move in 2002 and his arrangement to use space 31, he positioned himself much closer to the entrance way. That was nice but not necessary. Both his testimony and the video tapes showing his walking in the garage and the lobby establish that he can handle the trip from space 49 to the entrance way.

     The Association did not arbitrarily assign Rock to a parking space, namely handicap space 49, that was less convenient than another available space, namely handicap space 31. The non-handicap units belong to other owners. They cannot be taken from one or another of them to be combined so as to make a wider space closer to an entrance way for Rock's benefit. The

---

[1] At the close of Rock's case Defendants moved to dismiss the case against Defendant Stanley Richter on the ground that, as building manager, he had no role in the decisions concerning the assignment of a parking space to Rock. In light of the court's decision that Rock has failed to establish refusal to make a reasonable accommodation it is unnecessary to address this defense.

structure of the building prevents redesign to create larger parking spaces close to entrance ways.

There are a limited number of handicap parking spaces, namely four. Until 2003 no owner was demanding access to any of these spaces, and the Board had no reasons to address the question of allocating them. When the question of such allocation arose the Board acted in a totally fair and rational manner. It determined who among the condominium occupants might need such an accommodation. It ascertained that there were two persons suffering from similar leg disabilities - Rock and Burns.[2] It determined that two parking spaces could serve these two persons, although it appears that space 31 was more desirable than space 49. Seniority in the condominium was a rational way to determine which of the two disabled persons would be given preference.

Rock complains that defendants reneged on their initial 2002 approval of Rock's occupying space 31. The court finds that the Board never did approve Rock's occupation of space 31, and certainly did not approve of his use of that space in recognition of any disability. That was a private and unauthorized arrangement that Rock and Lott worked out between themselves.

Rock complains of the Association's overall delay in instituting a disability parking policy at Port Liberte. There was no overall delay in instituting a policy. Dealing with disabilities requires addressing each instance of a disability in light of its own circumstances. Here there existed handicap parking spaces available for use. There was no occasion to adopt a policy as to their use until the situation demanding their use arose. The particular circumstances here requiring adoption of a policy was the sudden appearance of two persons suffering from

---

[2] Burns was in a cast at the time, but apparently the cast has now been removed.

similar disabilities to whom two handicap spaces had to be awarded, one somewhat superior to the other.

Rock complains about the two months delay between restoring proper occupancy of parking spaces and providing Rock with a handicap space. In light of the confusion Rock and Lott had caused by their unauthorized exchange of spaces, in light of the fact that the Board, a volunteer body, had to investigate the engineering problems, the legal basis for the awarding of parking spaces, and the extent of the disabilities of Rock and Burns, the delay was hardly unreasonable.

Finally Rock faults the Association's failure to create additional appropriate handicap spaces in the parking garage to accommodate Burns or other tenants with disabilities. Such a solution was totally unreasonable in light of the legal rights of other owners to their parking spaces and in light of engineering realities.

### III. Conclusion

Rock has failed to establish that Defendants have refused to make a reasonable accommodation for his disability. Judgement will be entered in favor of defendants with costs of suit to be awarded.


Dated: September 20, 2006                     /s/  **Dickinson R. Debevoise**
                                              DICKINSON R. DEBEVOISE
                                              U.S.S.D.J.